IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

ANGELA GOODWIN                                                                                  PLAINTIFF

VS.                                        CASE NO. 07-CV-1093

CONAGRA POULTRY COMPANY
and PILGRIM'S PRIDE, INCORPORATED                                                DEFENDANTS

## MEMORANDUM OPINION

Before the Court is Defendants' refiled Motion for Summary Judgment. (Doc. No. 17). Plaintiff has responded. (Doc. No. 22). The Defendants have filed a reply to Plaintiff's response. (Doc. No. 26). The matter is ripe for consideration.

## BACKGROUND

Angela Goodwin is African-American. In 1977, she began working for the Defendant ConAgra Poultry Company at its chicken processing plant in El Dorado, Arkansas. From 1979 to 1996, Goodwin worked in the second processing department. From 1996 to 2000, Goodwin was a Union walking steward at the plant. In 2000, she returned to working at the plant, again, in second processing. On or about November 24, 2003, Defendant Pilgrim's Pride purchased ConAgra Poultry, along with the El Dorado processing plant. After the acquisition, Goodwin continued to work at the plant. She is currently employed by Pilgrim's Pride as a knife sharpener in the deboning area of the second processing department.

During their respective periods of ownership, both ConAgra and Pilgrim's Pride maintained anti-discrimination policies at the plant. Each company's policy prohibited intimidation, harassment and hostile acts against employees. Each policy provided a mechanism

for reporting discrimination and/or harassment complaints. Each company conducted anti-harassment and discrimination training sessions for its employees. Goodwin knew of each company's reporting procedure as well as their confidential 1-800 hotline for reporting any work related problems.

Goodwin belongs to the United Food and Commercial Workers Union Local 2008, the Union at the plant. As a Union member, she could utilize the collective bargaining agreements' grievance procedure to file complaints about aspects of his employment, including any racial discrimination and/or harassment. The grievance procedure consisted of four steps through which the complaining employee and the company would attempt to resolve the dispute. If a resolution could not be reached after the third step, the employee could take the complaint to binding arbitration. Goodwin was aware of the Union's grievance procedure. From 1996 to January 2000, she served as a walking steward for the Union.

As a walking steward, Goodwin worked exclusively for the Union. She spent her work shift walking around the plant in an attempt to prevent and resolve any disputes between Union members and management. Goodwin would also represent Union members in meetings with management regarding any problems an employee had in regard to his or her work at the company, including complaints involving racial discrimination.

In January 2000, Goodwin was removed from the steward position.[1] After her removal, Goodwin was offered a position at ConAgra if she wished to remain working at the plant. Goodwin accepted the third job offered – a temporary position in the deboning area. As a result

---

[1] The parties dispute whether the Union or the Union's President, Mike Keen, removed Goodwin as a steward. However, this dispute has no bearing on the Court's ruling on the pending Motion for Summary Judgment.

of taking this position, Goodwin did not miss a day of work after being removed from her job as a walking steward. She remained in this temporary position for approximately six months.

In July 2000, Goodwin successfully bid on and accepted the position of knife sharpener in the deboning area of second processing. There are approximately 90 employees who work on the processing line in this area.

As a knife sharpener, Goodwin is responsible for sharpening the knives and scissors used on the processing line. She spends approximately 60% of her time in the sharpening room sharpening and cleaning the knives and scissors. The remaining 40% of her time is spent transporting the sharpened knives and scissors to the processing line and returning with dull knives and scissors to be sharpened. Currently, Goodwin works with another knife sharpener, an African-American, in the knife sharpening room.

After she accepted the position, Goodwin claims that Doug Barney, the shift supervisor, called her into his office. Barney told her what he expected of her as a knife sharpener – the routine she was expected to follow. Goodwin claims that this was harassment. She then states that a month later Barney told her she was doing a good job and they laughed it off.

Because of her job, Goodwin was able to move freely around the deboning area. After taking the job, Goodwin has received several write-ups and/or warnings in regard to her staying out of her work area too much. In February 2001, Goodwin received a write-up from Lee Stewart, her African-American superintendent, for "staying out of her area too much." Goodwin was told that she needed to stay in her area and do her job. In March 2002, Goodwin received another employee counseling. This time she was told that there needed to be a knife sharpening on the floor at all times. And, in December 2003, Goodwin received a similar verbal counseling

3

from Rafael LaBrada, her Hispanic supervisor.[2]  This time she was counseled for taking care of personal business (asking people to participate in the Christmas dinner), rather than working. Goodwin believes that these write ups and warnings were the result of management not wanting her to have access to the employees on the line because she had been a Union steward.

After Goodwin took the job in the deboning area, she was supervised by various individuals, both African-American and Caucasian.[3]  Goodwin claims that she was harassed in some form or fashion by nearly all these individuals.[4]  However, she claims that her "biggest problem" was a Caucasian superintendent named Shelia Bagley.  Bagley was Goodwin's superintendent from late 2003 until December 2004 at which time Bagley was terminated.

First, Goodwin claims that Bagley harassed her by saying Goodwin's name on her walkie talkie too much.  Goodwin states that the supervisors at the plant used walkie talkies as a means of communicating with each other.  She states that Bagley called her name over the walkie talkie all the time, warning people where she was and what she was doing.

Next, Goodwin claims that Bagley would not let her leave her work to help get ready for baby showers at the plant.  Goodwin states that she would normally be the person who organized any baby showers or other similar events at the plant.  If such an event was planned, Goodwin

---

[2] Goodwin states that Bear, a Caucasian supervisor, was really the one behind this verbal reprimand.

[3] Goodwin's supervisors and superintendents included David Carbon, a Caucasian, Lois Welch, an African-American, Tim (last name unknown), a Caucasian, Lee Stewart, an African-American, Rafael LaBrada, a Hispanic, Shelia Bagley, a Caucasian, and Bear, a Caucasian.

[4] She claims that David Carbon blamed a dull knife on her when it wasn't dull.  She claims that Tim told her she couldn't use the bathroom after Loris Welch had told him that she went to the bathroom a lot.  She also claims that Lee Stewart harassed her by using a hostile tone with her and Bear helped Shelia Bagley harass her.

would leave work, go to the lunchroom and help set up for the event.  Goodwin claims that Bagley and Bear, another Caucasian superintendent, told her supervisor Rafael LaBrada that she wasn't allowed to get off the line to help with that kind of stuff anymore.

Even though Goodwin states that she was not upset about these things, she went to Joe Hanson, the plant manager, and complained.  Goodwin complained to Hanson about hearing her name over the walkie talkies and about not being allowed off the line to set up for baby showers.  She also told him that she believed Bagley was discriminating against her because of her race.  After she complained, Goodwin claims that her relationship with Bagley worsened.

Goodwin claims that Bagley then assigned her additional duties, outside her knife sharpening job.  She claims that Bagley told her supervisor, Rafael LaBrada, that when she was not busy sharpening knives she should be put on the processing line to split chicken breasts.  However, Goodwin did not indicate how often LaBrada put her on the line to split breasts.

Goodwin claims that in 2004, Bagley made her use a knife sharpener when it was unsafe.  Goodwin states that on one occasion when it was raining outside water was dripping on the electrical outlet were the knife sharpener was plugged in.  She asked her supervisor to call a maintenance man to come and cover up the plugs.  While she was waiting for maintenance to come, Bagley came into the knife sharpening room.  Goodwin states that Bagley wanted to know why she wasn't working.  She states that even though she told Bagley about the dripping water, Bragley told her to get to work.  Goodwin told Bagley it was unsafe and refused to use the knife sharpener.

Goodwin claims that Bagley then removed the stool from the knife sharpening room.  She states that there was a little stool in the sharpening room so the guy who operates the cleaning

5

machine could sit. A lot of times when she was doing her paperwork, Goodwin would sit on this stool. Goodwin claims that Bagley removed the stool so she wouldn't have a place to sit.

Goodwin claims that Bagley would always shadow her during the day to see what she was doing. She would go behind her on the line and check to see if her knives were sharp. Goodwin states that on one occasion she went to get a new smock and Bagley stopped her. Bagley asked Goodwin were she was going. Bagley then used her walkie talkie to check and see if Goodwin had permission to be out of her work area. Goodwin also states that on one occasion Bagley came into the knife sharpening room and looked over her shoulder when Goodwin was doing her paperwork. Goodwin believes that Bagley was looking to see if she had any Union literature. In each of these instance, Goodwin believes that Bagley was harassing her because of her race.

In 2003, Goodwin bid on and was awarded a position in the washroom, an area in which Bagley did not oversee. Goodwind did not accept the job because she wasn't going to let a woman run her off. Thereafter, Goodwin remained in the knife sharpening job.

Goodwin claims that Bear, another Caucasian superintendent, caused her to be reprimanded unfairly. Goodwin states that in late 2003, she was gathering the names of people who wanted to attend the Christmas potluck dinner. She received a verbal counseling for being out of her work area. Goodwin claims that this was discriminatory because Bear allowed other African-American employees to gather the same potluck information that she was gathering.

Goodwin admits that during her tenure at the plant, she has never heard Shelia Bagley or any other supervisor use the word "nigger." She also admits that she has never had that word or any other racial slur or epithet directed toward her by either a supervisor or Caucasian employee at the plant. Goodwin does claim, however, that she was called a "gal" or a " little girl" by a

supervisor on two separate occasions.

Goodwin claims that Bagley used the word "gals" when referring to a group of African-American workers. Goodwin states that Bagley walked into the lunchroom where she saw Goodwin and group of African-American women sitting. Bagley did not know their names, so she referred to the women as "gals." Goodwin claims that this term was racist. She also claims that Bagley's use of the term was discriminatory because as a superintendent Bagley should have known the employees' names.

Next, Goodwin claims that in the early 90's, during a heated discussion, Granville Record, a Caucasian supervisor, pointed his finger in Goodwin's face and called her a "little girl, uneducated." Goodwin claims that this remark was racist.

Goodwin also claims that she witnesses two racist writings during her tenure at the plant.[5] In 1999, John Woodall, the plant manager, put a notice on the plant door telling employees that the plant would be running on Saturday. The notice referred to the employees who were required to work as "You folks." Goodwin claims that this is racist.

Goodwin also claims that she vaguely remembers a racial joke being put on bid sheet on the plant's bulletin board. She admits that she does not remember what the joke was about and that she was not personally offended by it.

Goodwin claims that the walls of the bathrooms in the plant were defaced with racial graffiti. Goodwin admits that the graffiti never referred to her by name or threatened her physically. Although she claims that some of the comments offended her, she admits that it never affected her ability to do her job. Goodwin states that in 1997, when she was a walking steward,

---

[5] These are in addition to the allege racial graffiti in the plant's bathrooms.

she spoke to Terry Purdue, the plant's human resources manager, about the graffiti. Purdue asked for Goodwin's assistance in preventing and remedying the problem. After her conversation with Purdue, the walls of the bathroom were painted. In fact, Goodwin admits that the bathrooms were painted all the time.

Goodwin also claims that the bathrooms were filthy and there was a hole in the ceiling.[6] She claims that the condition of the bathroom is evidence of race discrimination. However, Goodwin admits that Caucasian and Hispanic employees also use this bathroom.

Since 2000, Goodwin has filed more than three or four grievance with the Union. However, none of these grievances related in any way to her claim of a hostile work environment. On one occasion, Goodwin placed a call to the ConAgra 1-800 hotline. During the call, Goodwin did not complain about race discrimination or harassment. Rather, she asked questions about the company's bomb-threat procedures.

Goodwin states that she has been the troublemaker in the plant for a long time because she is very outspoken and stands up for what is right. Goodwin states that she has gone to management on numerous occasions and complained about all the problems in the plant. In fact, she claims that as recently as 2004, she went to Ray Poole, the human resources director, and complained. She claims that nothing was ever done in response to her complaints. Goodwin states that management has wanted to remove her from her job ever since she got it because they didn't want her to have access to other employees. She believes that this was due to the adverse relationship she had with management during her time as a walking steward.

---

[6] In November 2003, Goodwin took photographs of the hole in the bathroom ceiling. No photographs were taken of any graffiti on the bathroom walls.

On December 22, 2003, Goodwin, along with seven other employees, filed a class action lawsuit against ConAgra and Pilgrim's Pride. In the Class Action Complaint, Goodwin alleged that she had been subjected to racial discrimination at the El Dorado plant. She claimed that the discrimination was in the form of failure to promote and a hostile work environment in violation of 42 U.S.C. § 1981 and the Arkansas Civil Rights Act of 1993.

On April 27, 2005, the Defendants moved for summary judgment on all of Goodwin's claims. In her response, Goodwin stated that she was not maintaining a failure to promote claim against the Defendants. Therefore, on March 28, 2006, the Court granted summary judgment as to Goodwin's claim for failure to promote. Summary judgment was denied as to Goodwin's hostile work environment claim on the grounds that merits-based discovery had not begun. The Court ruled that the motion was premature. It also ruled that it could be refiled at a later date.

On May 15, 2007, the Court denied the Class Action Plaintiffs' Motion for Class Certification. Thereafter, the parties agreed that each class representative would proceed with their individual claims in separate lawsuits under newly assigned case numbers. The parties also agreed that no additional discovery was needed and that the Defendants could refile their previously filed summary judgment motions against the individual plaintiffs.

On September 19, 2007, Goodwin filed her individual Complaint against the Defendants. On November 6, 2007, Goodwin amended her Complaint. In her Amended Complaint, Goodwin alleges that the Defendants discriminated against her because of his race in violation of 42 U.S.C. § 1981 and the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-102, 107. Specifically, Goodwin claims that she was subjected to a hostile work environment. The matter is now before the Court on Defendants' refiled Motion for Summary Judgment.

STANDARD OF REVIEW

The standard of review for summary judgment is well established. The Federal Rules of Civil Procedure provide that when a party moves for summary judgment;

> The judgment sought shall be rendered forthwith if the pleadings, dispositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Krenik v. County of LeSueur,* 47 F.3d 953 (8th Cir. 1995). The Supreme Court has issued the following guidelines for trial courts to determine whether this standard has been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial–whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 250 (1986). *See also Agristor Leasing v. Farrow,* 826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-Management Pension Fund,* 800 F.2d 742, 746 (8th Cir. 1986). A fact is material only when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* The nonmoving party must then demonstrate the existence of specific facts in the record that create a

genuine issue for trial. *Krenik v. County of LeSueur,* 47 F.3d at 957. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256.

DISCUSSION

In her Amended Complaint, Goodwin alleges that she was subjected to a hostile work environment when she was subjected to abusive language at the plant, witnessed racial graffiti on the bathroom walls at the plant and witnessed African-American employees being treated differently than Caucasian employees in that they were treated in a disrespectful manner. She claims that this discrimination was in violation of 42 U.S.C. § 1981 and the Arkansas Civl Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-102, 107.

In employment discrimination cases under 42 U.S.C. § 1981 and the ACRA, the courts apply the familiar three-step burden shifting framework set out in *McDonnell Douglas Corp. v. Green,* 41 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Putman v. Unity Health Sys.,* 348 F.3d 732, 735 n.2 (8th Cir. 2003)(applying *McDonnell Douglas* to § 1981 claim); *Crone v. United Parcel Serv., Inc.,* 302 F.3d 942, 945 (8th Cir. 2002) (applying *McDonnell Douglas* to ACRA claim). Under *McDonnell Douglas,* the plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff is able to do this, the burden of production then shifts to the defendant to assert a legitimate non-discriminatory reason for the alleged discrimination. If the defendant sets forth such a reason, the burden then shifts back to the plaintiff to establish that the asserted reason was merely a pretext for discrimination. The Court will review each of Goodwin's claims in light of the above burden shifting framework.

Goodwin claims that she has been subjected to a hostile work environment at the plant. In order to establish a racially hostile work environment claim, an employee must show that: 1) she was a member of a protected group; 2) she was subjected to unwelcome race-based harassment; 3) the harassment was because of her membership in the protected group; and 4) the harassment affected a term, condition, or privilege of her employment. *Elmahdi v. Marriott Hotel Services, Inc.,* 339 F.3d 645 (8th Cir. 2003). Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment. *Elmahdi,* 339 F.3d. at 652. The conduct must be severe "as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim." *Id.* (quoting *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir. 1998)). Merely feeling offended, however, does not sufficiently affect the conditions of employment to support a claim. *Id.,* 339 F.3d at 653 (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). In determining whether sufficient evidence of a hostile work environment claims has been presented, courts consider all the attendant circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Elmahdi,* 339 F.3d. at 652-53. To satisfy the high threshold of actionable harm, the employee must show that his workplace was permeated with discriminatory intimidation, ridicule and insult. *Elmahdi,* 339 F.3d. at 653.

*Abusive Language at the Plant*

Goodwin claims that she was subjected to a hostile work environment by the Defendants when she was subjected to abusive language at the plant. There is no doubt that Goodwin is a member of a protected group – African American. Thus, she can establish the first element of her

12

*prima facie* case of hostile work environment.  However, the Defendants contend that Goodwin can not show the other elements of her *prima facie* case – that she was subjected to unwelcome race-based harassment, that the alleged harassment was because of her membership in the protected group and that it affected a term, condition or privilege of her employment.

In support of this claim, Goodwin does not contend that she subjected to profanity at the plant.  Goodwin also does not contend that she was ever called  a "nigger" or any other racial slur by any supervisors or employees at the plant.  In fact, Goodwin admits that she never heard any supervisor use the "N" word or any other racial slur at the plant.  Rather, Goodwin claims that she was called a "gal" or a "girl" by a supervisor on two separate occasions.

First, Goodwin claims that Shelia Bagley used the word "gals" when referring to Goodwin and a group of African-American women.  Goodwin contends that this word is racist.  She also contends that Bagley's use of the word was discriminatory because she should have known the employees' names.

There is nothing inherently racial about the term "gal."   The term is  racially neutral and does not reveal any racial animus toward African-American women.  There is also no evidence that Bagley's use of the term was motivated by or based upon the employees' race.  In fact, Goodwin states that Bagley used the word because she did not know the employees' names.  No reasonable person could attribute any racial animus to the use of the word "gals" in this situation. The use of this word by Bagley did not subject Goodwin to unwelcome race-based harassment and it did not affect a term or condition of her employment.  *See Palesch v. Missouri Comm'n on Human Rights,* 233 F.3d 560, 566-68 (8th Cir. 2000).  Thus, it is not sufficient to support a claim of a hostile work environment.

13

Next, Goodwin claims that in the early 90's, Granville Record called her a "little girl, uneducated." She claims that the use of these words was racist.

Again, there is nothing inherently racial about the terms "little girl" or "uneducated." The terms are racially neutral and do not reveal any racial animus toward African-American women. There is also no evidence that Record's use of the terms was motivated by or based upon Goodwin's race. In fact, the evidence shows that the words were used in a heated exchange between Record and Goodwin. No reasonable person would attribute any racial animus to their use in this case. The use of these words by Record did not subject Goodwin to unwelcome race-based harassment and did not affect a term or condition of her employment. *Id.* Thus, they are not sufficient to support her claim of a hostile work environment.

The discrimination laws are not a general civility code. Thus, the abusive language of which Goodwin complains is not what a reasonable person would consider harassment. It was not severe or pervasive enough to amount to a discriminatory change in the terms and conditions of her employment. Thus, Goodwin has failed to establish a *prima facie* case of hostile work environment in connection with the alleged abusive language at the plant. Accordingly, the Court finds that this claim must fail as a matter of law.

*Racial Graffiti in the Bathroom*

Next, Goodwin claims that the presence of racial graffiti on the bathroom walls at the plant created a hostile work environment for her. She complained about the graffiti to Terry Purdue, the plant's human resources manager. After complaining to Purdue, the bathroom walls were painted. In fact, Goodwin states that the bathroom walls were painted all the time.

In this instance, the graffiti was not specifically directed at Goodwin. It did not physically

threaten her. It did not affect her ability to work. It was painted over by the Defendants. It is apparent that the presence of graffiti on the walls in the plant's bathroom was not sufficiently severe or pervasive enough to affect the terms and conditions of Goodwin's employment. *See Woodland v. Joseph T. Ryerson & Son, Inc.,* 302 F.3d 839, 843-44 (8th Cir. 2002). Thus, it is insufficient to create a hostile work environment.

Next, Goodwin claims that the disrepair and filthy condition of the bathroom created a hostile work environment. However, Goodwin admits that not only do African-American use this bathroom, but so do Caucasian and Hispanic employees. Because all production employees at the plant use this bathroom, it can not be said that the alleged harassment was because of Goodwin's race. Thus, it is insufficient to create a hostile work environment as to Goodwin.

Finally, Goodwin contends that during her tenure at the plant she has witnessed two other instances of racist writings. The first instance involved a notice placed on the door of the plant informing employees they needed to work on Saturday. This notice used the words "You folks." Goodwin contends that these words are racist.

There is nothing inherently racial about the terms "You folks." Rather, the terms are racially neutral. There is also no evidence that the use of these terms was motivated by or based upon the race. In fact, the words "You folks" was directed to all employees, African-American, Caucasian and Hispanic, who were required to work that particular Saturday. No reasonable person could attribute any racial animus to their use in this case. The use of these words did not subject Goodwin to unwelcome race-based harassment and did not affect a term or condition of her employment. *See Palesch,* 233 F.3d at 566-68. Thus, it is not sufficient to support Goodwin's claim of a hostile work environment.

15

The second instance of racist writing at the plant involved a racist joke placed on a bid sheet on the plant's bulletin board. Goodwin does not remember any details of the writing. She does, however, remember that she was not personally offended by it. This vague recollection of a racist joke that did not offend Goodwin is insufficient to create a hostile work environment for her. Thus, Goodwin has failed to establish a *prima facie* case of a hostile work environment in connection with the presence of graffiti in the bathroom or other racists writings at the plant. Accordingly, the Court finds that this claim must fail as a matter of law.

*African-American Employees treated Disrespectfully*

Goodwin claims that she was subjected to a hostile work environment when she witnessed African-American employees being treated differently than Caucasian employees in that they were treated in a disrespectful manner. In support of this claim, Goodwin first points to various claims of alleged racial discrimination she received during her tenure as a walking steward for the Union. However, Goodwin did not personally suffer any of this alleged mistreatment. Thus, the Court will not consider it in regard to Goodwin's claim of a hostile work environment. *See Williams v. ConAgra,* 378 F.3d 790, 795 (8th Cir. 2004).

Next, Goodwin claims that ever since she got the knife sharpening job in 2000, management has wanted to remove her from the job because they didn't want her to have access to other employees. She believes that this was due to the adverse relationship she had with management during her tenure as a walking steward and the fact that she was very outspoken. Goodwin claims that although all her supervisors took part in this harassment, her biggest problem was her Caucasian supervisor Shelia Bagley.

In support of her claim, Goodwin contends that Bagley would say her name over the

16

walkie talkie all the time – reporting where she was and what she was doing to other supervisors. Bagley would follow her around checking to see if she was doing her job. Bagley would stop her when she was out of her work area and ask what she was doing and if she had permission from her supervisor. Bagley would not let her leave her work area to help with baby showers or other events at the plant. Bagley and another supervisor named Bear would not allow her to go up and down the line and gather the employees' names for the Christmas potluck dinner, even though they allowed other African-American employees to gather the same information. And, on one occasion when she was doing paperwork in the knife sharpening room, Bagley came in and looked over her shoulder to see what she was doing. Goodwin claims that all the harassment at the hands of Bagley and her other supervisors was because of her race.

      Goodwin's claims stem from the fact that Bagley closely monitored Goodwin while she worked. She wanted Goodwin in her work area doing her job. Close monitoring by a supervisor does not constitute a hostile work environment unless it affects a term or condition of one's employment. *See Lewis v. Potter,* 114 Fed.Appx. 262 (8th Cir. 2004). Here, Goodwin admits that it did not affect her ability to do her job. In fact, Goodwin stayed in her job rather than "let a woman run her off." It is apparent that the alleged harassment of which Goodwin complains was not so severe or pervasive as to affect a term or condition of her employment. Thus, it is insufficient to support her claim of a hostile work environment.

      Goodwin claims that Bagley told her supervisor, Rafael LaBrada, to put her on the line splitting chicken breasts when she wasn't sharpening knives. However, it is unclear how often Bagley was required to perform these additional duties. Thus, there is no evidence that the assignment of these additional duties was severe or pervasive enough to affect a term or condition

17

of Goodwin's employment.

Goodwin also claims that on one occasion Bagley ordered her to work on a knife sharpener while water was dripping on the outlet. However, the evidence shows that Goodwin refused to use the electric knife sharpener because it was unsafe. Thus, this is neither severe or pervasive enough to constitute a hostile work environment.

Finally, Goodwin claims that Bagley removed the small stool from the knife sharpening room so Goodwin couldn't sit down. While Bagley's conduct was unprofessional and immature, it is not sufficiently severe or pervasive to affect a term or condition of Goodwin's employment.

While Goodwin's work environment may have been unpleasant and annoying, it was not permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the terms or conditions of her employment. Thus, Goodwin has failed to establish a *prima facie* case of a hostile work environment in regard to the disrespectful conduct of Shelia Bagley and her other supervisors. Accordingly, the Court finds that this claim must fail as a matter of law.

## CONCLUSION

For the reasons discussed herein above, the Court finds that Defendants' Motion for Summary Judgment should be and hereby is **granted**. A judgment of even date, consistent with this Opinion, will be issued.

IT IS SO ORDERED, this 30th day of September, 2008.

                 /s/Harry F. Barnes
                 Hon. Harry F. Barnes
                 United States District Judge